UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                              :

UNITED STATES OF AMERICA          :

                              :

           - v. -               :          10 Cr. 334 (DC)

                              :

FEDERICO HERNANDEZ,           :

                              :

            Defendant.       :

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>SENTENCING MEMORANDUM</u>

 

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

DAVID B. MASSEY
Assistant United States Attorney,
       Of Counsel.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

September 10, 2010

**BY ECF**
The Honorable Denny Chin
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007
Fax: 212-857-2346

     Re:  *United States* v. *Federico Hernandez*, 10 Cr. 334 (DC)

Dear Judge Chin:

   The Government respectfully submits this letter in advance of the September 17, 2010 sentencing of the defendant Federico Hernandez, and in response to Mr. Hernandez's sentencing memorandum dated August 6, 2010 (hereinafter, "Hernandez Mem.").  For the reasons stated below, the Government respectfully requests that the Court sentence the defendant within the stipulated Guidelines range of 18 to 24 months.

   This is an unusually important sentencing for general deterrence purposes.  The prosecution of Hernandez is part of a nationwide crackdown by the Department of Justice and the Internal Revenue Service on the rampant problem of unreported foreign bank accounts held by U.S. taxpayers.  In February 2009, the Swiss bank UBS entered into a deferred prosecution agreement with the Government in which UBS admitted that it had, for several years, helped U.S. taxpayers conceal the existence of, and evade payment of taxes on, foreign bank accounts. In the agreement, UBS agreed to end its business of servicing unreported bank accounts of U.S. taxpayers, and to pay $780 million in fines, penalties, interest and restitution.  In addition, as part of the agreement, UBS gave the Government account records for more than 200 U.S. taxpayers who owned unreported accounts at UBS during 2000 to 2007, including Hernandez.  And in 2010, pursuant to a separate agreement and a vote of the Swiss parliament, UBS has now agreed to provide account records for an additional 4,450 U.S. taxpayers.  The widespread news reports concerning these events and the prosecution of several UBS customers in 2009 and 2010 in the Southern District of Florida and elsewhere around the country resulted in massive and unprecedented flow of voluntary disclosure applications to the IRS in 2009 and 2010 concerning offshore bank accounts.  In 2009, more than 14, 000 U.S. taxpayers – mostly individuals with

Hon. Denny Chin
September 10, 2010
Page 3

undeclared offshore accounts – were accepted into the voluntary disclosure program after the announcement of the deferred prosecution agreement with UBS.  Before the announcement of the UBS deferred prosecution agreement, only about 40 taxpayers were accepted each year into the voluntary disclosure program.

The sentencing of Hernandez is particularly important in the context of this initiative because it is the first genuinely contested sentencing in any of UBS offshore banking cases, and it occurs at a critical time in the Government's ongoing investigation of other U.S. taxpayers and financial institutions.  The Department of Justice has publicly stated that it is investigating other foreign banks who engaged in the same conduct as UBS, and this has been reported in the financial press.  *See, e.g.*, Bloomberg News, "HSBC Clients With Asian Accounts Said To Face U.S. Tax Probe, July 6, 2010, at 3 (attached as Exhibit N).  A number of white collar criminal defense attorneys around the country are following the Government's ongoing investigation of offshore banking.  *Id.* at 1-3.  At the same time, many of the same attorneys are advising clients whether to voluntarily disclose their accounts to the IRS.  The Court's sentence of Hernandez in this case is very likely to have an effect on that advice.  The Court's sentence is also very likely to influence other contested sentencings of UBS customers in this and other Districts.  There are six pending UBS customer cases in the Southern District of New York alone.

In addition, a Guidelines sentence is warranted in Hernandez's case because his conduct was substantially worse than the 18 to 24 month Guidelines range would suggest.  As described in more detail below, the tax loss to the Government as a result of his conduct was $510,193, more than six times the amount of the tax loss that was used to calculate his Guidelines range at the time of his plea ($84,423).  This and other sentencing factors counterbalance the family circumstances factor; the Government will address this issue in a supplemental letter to the Court under seal.

## I.      Offense Conduct

During the period 2001 through at least 2008, Hernandez was the sole owner of bank accounts at UBS in Switzerland, and he concealed that important fact from the IRS by filing false individual tax returns and by creating other false documents for UBS's files.  By doing so, and by falsely omitting other income from his tax returns during those years, Hernandez evaded at least $510,193 in U.S. taxes.

The information filed against Hernandez on April 15, 2010 ("the Information"), and the Pre-sentencing Investigation Report of August 12, 2010 ("the PSR"), contain an accurate and detailed description Hernandez's UBS accounts held in the names of sham corporations: 2020 Emerging, Ltd. (hereinafter, "the 2020 Emerging Account") and Pondbridge Corp. (hereinafter, "the Pondbridge Account").  *See* PSR ¶ 6 – 26.  UBS records show that Hernandez was the sole beneficial owner of both accounts.  For example, on October 14, 2001, and again on December 17, 2004, Hernandez signed UBS documents confirming that he was the sole beneficial owner of the 2020 Emerging Account.  In addition, on July 28, 2006, Hernandez opened the Pondbridge Account and certified that to UBS that he was the sole beneficial owner of the account.

Hon. Denny Chin
September 10, 2010
Page 4

      Several facts show the systematic and premeditated nature of Hernandez's scheme to conceal his UBS accounts through lies to the IRS:

- Eight years in a row – that is, for calendar years 2001 through 2008 – Hernandez lied to his professional tax preparer when he failed to disclose the existence of the UBS accounts and the interest, dividends, and/or capital gains that he earned from the accounts.

- Eight years in a row, Hernandez lied to the IRS by failing to report the UBS accounts on his individual tax returns, which were signed and sworn under penalties of perjury. He repeatedly failed to disclose not only the existence of the accounts but also the interest, dividends, and/or capital gains that he earned in the accounts. And in 2007 and 2008, Hernandez affirmatively lied on Schedule B of his returns when he falsely stated that he did not have an interest in, or a signature or other authority over, a financial account in a foreign country, when, in truth and in fact, as Hernandez well knew, he was the sole beneficial owner of a UBS account during those years. (For calendar years 2001 through 2006, Hernandez failed to file a completed Schedule B).

- According to UBS documents, Hernandez personally traveled to Switzerland three times each year to conduct business at UBS. *See* UBS Write Up for 2020 Emerging Ltd. FIM (Financial Intermediary) Approval, March 2005, attached as Exhibit S, at PA 0562 0059.

- Hernandez instructed UBS to retain and hold all correspondence relating to his accounts in Switzerland, where it would remain outside the reach of United States law enforcement authorities. Hernandez paid a fee for this service.

- On four separate occasions, Hernandez signed, under penalties of perjury, an IRS Form W8-BEN or UBS's Substitute Form W8-BEN, in which he falsely certified that the beneficial owner of his accounts was not a U.S. person, and that 2020 Emerging 2020 Emerging Ltd. and Pondbridge Corp. were the beneficial owners of the accounts. PSR ¶¶ 13, 14, 16.

- Hernandez held up to $8.8 million in his UBS accounts. The year-end account balances in Hernandez's 2020 Emerging and Pondbridge Accounts were approximately as follows:

| Account | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| 2020 Emerging | $478,681 | $652,579 | $624,352 | $1,912,713 | $5,062,900 | $6,760,402 | $95,703 |
| Pondbridge | 0 | 0 | 0 | 0 | 0 | $2,038,994 | $5,491,137 |
| **Totals** | $478,681 | $652,579 | $624,352 | $1,912,713 | $5,062,900 | $8,799,396 | $5,586,840 |

Hon. Denny Chin
September 10, 2010
Page 5

- *Five years in a row* – that is, for tax years 2004 through 2008 – Hernandez lied not only to conceal his UBS accounts and evade the taxes on that income, but also to conceal hundreds of thousands of dollars of other income, and thereby evade considerable taxes on that income as well. As the following chart shows, during the years 2004 through 2008, Hernandez only reported a stunning 26 percent ($503,683) of the $1.9 million in adjusted gross income ("AGI") that he earned:

| Tax Year | Originally reported AGI | Unreported Interest and Dividends from UBS Accounts | Unreported capital gains (UBS and other) | Unreported Retrocession (referral fee) income from UBS | Unreported concierge services income | Total Unreport-ed income | Total Correct-ed AGI | Originally reported AGI as % of Total Corrected AGI | Additional tax due (total tax loss) | Year end account balance in UBS Accounts |
|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | $43,162 | 6,690 | 73,029 | 65,181 | 15,000 | 159,900 | 197,397 | 22% | 49,767 | 1.9 million |
| 2005 | $114,530 | 29,031 | 89,534 | 71,935 | 15,000 | 205,500 | 317,545 | 36% | 74,030 | 5.1 million |
| 2006 | $142,112 | 72,250 | 408,147 | 55,103 | 15,000 | 550,500 | 691,320 | 21% | 189,700 | 8.8 million |
| 2007 | $94,729 | 167,520 | 2,440 | 109,963 | 15,000 | 294,923 | 383,987 | 25% | 108,416 | 5.6 million |
| 2008 | $109,150 | 3,533 | 36,348 | 162,019 | 15,000 | 216,910 | 317,355 | 34% | 88,280 | unknown |
| **Totals** | **$503,683** | **278,580** | **609,498** | **464,201** | **75,000** | **1,427,733** | **1,907,604** | **26%** | **510,193** | |

*See* PSR ¶ 79; *see also* Hernandez's Amended Tax Returns for 2004 through 2008, attached under seal as Exhibits E, G, I, K, and M. Put another way, Hernandez lied to conceal more than $1.4 million in income during those years.

The chart further shows that Hernandez's wholesale under-reporting of personal income spanned several categories of income, including interest and dividends earned from his UBS accounts; capital gains earned from UBS accounts and other investments; referral fee income that he earned as a result of his role as an introducing agent or "financial intermediary" for UBS (so called "retrocession income"); and income that he earned each year from performing concierge services for his clients.

And as the chart shows, the total tax loss to the Government as a result of Hernandez's conduct for calendar years 2004 through 2008 was not merely the $84,423 described in the Information (which served as the basis for the tax loss calculation in the Plea Agreement). The total tax loss was, by Hernandez's own admission in his amended tax returns for 2004 through 2008, substantially higher: $510,193. If this new, higher figure were used to calculate Hernandez's Guidelines range, his sentencing Guidelines range would be 30 to 37 months' imprisonment, rather than 18 to 24 months' imprisonment. (Base offense level 20 for a tax loss between $400,000 and $1,000,000, *see* U.S.S.G. §§ 2T1.1(a) and 2T4.1(H); plus two points for sophisticated means pursuant to U.S.S.G. § 2T1.1(b)(2); minus three points for acceptance of responsibility; Total Offense Level 19; Criminal History Category I).

Hon. Denny Chin
September 10, 2010
Page 6

In addition, Hernandez's filed false returns for calendar years 2001 through 2003 as well. (Hernandez was not charged with filing false tax returns for 2001 through 2003; those years are beyond the statute of limitations).  In each of these years, Hernandez reported the following:

| Tax Year | AGI as reported on tax returns. | Interest and dividends reported | Capital gains reported | Retrocession (referral fee) income reported | Concierge services income reported | Gambling winnings reported | Gambling winnings reported as % of AGI reported | Taxes Due (as reported) | Earned Income Tax Credit (EITC) claimed | Taxes paid (Taxes due minus EITC) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | $22,781 | 111 | -3000 | 0 | 0 | 15,250 | 67% | 1,390 | 401 | 989 |
| 2002 | $64,747 | 86 | -3000 | 0 | 0 | 67,072 | 104% | 1,926 | 0 | 1,926 |
| 2003 | $7,236 | 203 | -3000 | 0 | 0 | 6,164 | 85% | 1,993 | 4,204 | -2,211 |
| Totals | **$94,764** | **400** | **-9000** | **0** | **0** | **88,486** | **93%** | **5,309** | **4,605** | **704** |

*See* Hernandez's Tax Returns for 2001 through 2003, attached under seal as Exhibit A through C.  In these years, Hernandez lied to the IRS by not reporting the existence of the 2020 Emerging Account, and any interest, dividends, or capital gains earned.  And, in light of the corrected income shown in Hernandez's amended returns for 2004 through 2008, the income figures reported for 2001 through 2003 are absurdly low on their face: $22,781 for 2001; $64,747 for 2002; and $7,236 for 2003.  Indeed, the income reported during those years was so low that Hernandez claimed the Earned Income Tax Credit (EITC) in 2001 and 2003, which even resulted in a net public assistance payment of $2,211 from the U.S. Government to Hernandez in 2003.  Meanwhile, Hernandez had over $624,000 in his UBS account at the end of 2003.  See Chart at 4, *supra.*

A quick comparison between Hernandez's reported earnings in 2001 through 2003 and the corrected earnings shown in his amended returns for 2004-2008 (*see* Chart at 5, *supra*; *see also* Exhibits E, G, I, K, M) shows that he underreported his earnings in 2001 through 2003.  For example:

- For calendar years 2001 through 2003, Hernandez reported no concierge services income; in 2004 through 2008, according to his amended returns for those years, he earned approximately $15,000 per year in such income.  *See* Chart at 5, *supra*.

- For calendar years 2001 through 2003, Hernandez reported a total of $400 in interest and dividend income; by contrast, as shown in his amended returns for 2004 through 2008, he earned an average of approximately $55,000 in interest and dividend income over the years 2004 through 2008.  *See* Chart at 5, *supra*.

- And with respect to capital gains, Hernandez reported net capital losses (in the form of a loss carryforward) over the years 2001 through 2003; by contrast, as shown in his amended returns for 2004 through 2008, he earned over $120,000 on

Hon. Denny Chin
September 10, 2010
Page 7

average each year in capital gains from 2004 through 2008.  *See* Chart at 5, *supra*.

It is extremely unlikely that Hernandez's income in all these categories was so much lower in 2001 through 2003 than it was in 2004 through 2008.  Thus, it is very likely that Hernandez lied on his 2001 through 2003 returns not only by failing to disclose his UBS account during those years, but also by underreporting his other income, as he did in 2004 through 2008.  Hernandez was not charged with filing false returns for 2001 to 2003 and was not required to amend his returns for those years, but the Court should consider these false statements under Section 3553(a) because they increase the seriousness of his offense and they are not otherwise captured in his Guidelines calculation.

## II.   Information and Guilty Plea

On or about April 15, 2010, the Government filed, and Hernandez pled guilty to, the Information, which contained five counts.  Counts One through Five charged the defendant with subscribing to a false individual tax return, in violation of Title 26, United States Code, Section 7206(1), for the years 2004 through 2008.  (Each Count charges a different year.)  Each count carries a maximum sentence of three years' imprisonment, a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $100,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to the United States, a maximum term of supervised release of one year, a $100 special assessment, and the costs of prosecution.

Hernandez pled guilty pursuant to a plea agreement dated April 14, 2010 (the "Plea Agreement")(attached hereto as Exhibit O).  The Plea Agreement contains the following stipulated Guidelines calculation:

1.     Pursuant to U.S.S.G. § 3D1.2(d), Counts One through Five are grouped.

2.     Because the tax loss resulting from the charged conduct was between $80,000 and $200,000, the defendant's base offense level is 16, pursuant to U.S.S.G. §§ 2T1.1(a) and 2T4.1(F).

3.     Because the offenses charged in Counts One through Five involved sophisticated means, the defendants's offense level is increased by two points, to level 18, pursuant to U.S.S.G. § 2T1.1(b)(2).

4.     Three points are subtracted for acceptance of responsibility pursuant to U.S.S.G § 3E1.1.

5.     In accordance with the above, the applicable Guidelines offense level is 15.

6.     Hernandez has no criminal history points and is in Criminal History Category I.

Hon. Denny Chin
September 10, 2010
Page 8

      7.     Based upon the calculations set forth above, the defendant's stipulated sentencing Guidelines range is 18 to 24 months' imprisonment (the "Stipulated Guidelines Range"), and the applicable fine range is $4,000 to $40,000.

      The Agreement does not permit the parties to seek a "departure" within the Guidelines framework, but does permit either party to seek a sentence outside of the Stipulated Guidelines Range based upon the factors of Section 3553(a).

## III.    Hernandez Should Receive a Guidelines Sentence Based on the Factors of Section 3553(a)

      Hernandez should receive a Guidelines sentence of 18 to 24 months for the reasons stated below and for the reasons stated in the Government's sealed supplemental sentencing letter, which addresses the family circumstances issue.

### A.    Applicable Law

      Section 3553(a) of Title 18, United States Code, provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth specific considerations, including:

- the history and characteristics of the defendant;

- the sentencing range under the Guidelines;

- the seriousness of the offense, the need to promote respect for the law, and to provide just punishment for the offense;

- the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;

- the need to avoid unwarranted sentencing disparities;

- the defendant's need for rehabilitation; and

- the kinds of sentences available.

18 U.S.C. § 3553(a).

### B.    The Guidelines Remain an Important Sentencing Factor

      The Guidelines range itself continues to be an important sentencing factor.  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. 586, 594 (2007), the District Court must treat the Guidelines as the "starting point and the initial

Hon. Denny Chin
September 10, 2010
Page 9

benchmark" in sentencing proceeds.  *Id.* at 596; *see also United States* v. *Rattoballi*, 452 F.3d
127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory
list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with
important exceptions, their calculations were based upon the actual sentences of many judges.'")
(quoting *United States* v. *Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc));
*Kimbrough* v. *United States*, 128 S. Ct. 558, 574 (2007); *United States* v. *Crosby*, 397 F.3d 103,
113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and Section 3553(a) do
more than render the Guidelines a body of casual advice, to be consulted or overlooked at the
whim of a sentencing judge.").

Here, the parties have agreed that the Guidelines range is 18 to 24 months' imprisonment,
and that "a sentence within the Stipulated Guidelines Range would constitute a reasonable
sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a)."
Plea Agreement (Exhibit O), at 4.  This is a factor in favor of a Guidelines sentence.

### C.  Hernandez Should Receive a Guidelines Sentence Based on the Seriousness of the Offense

As described above, Hernandez's offense conduct was systematic, premeditated, long-
running, and it resulted in substantially more tax loss than the Guidelines range of 18 to 24
months would suggest.  As noted above, the total tax loss to the Government as a result of Mr.
Hernandez's conduct was not merely the $84,423 described in the Information (which served as
the basis for the tax loss calculation in the Plea Agreement).  The total tax loss was, by
Hernandez's own admission in his amended tax returns, substantially higher: $510,193.  If this
higher figure were used to calculate Mr. Hernandez's Guidelines, his sentencing Guidelines
range would be 30 to 37 months' imprisonment, rather than 18 to 24 months' imprisonment.
This figure does not include Hernandez's under reporting of income during the years 2001
through 2003.  Meanwhile, during these same years, Hernandez had hundreds of thousands of
dollars, or millions of dollars (up to $8.8 million), depending on the year, in his UBS accounts
with which he could have paid his taxes.  *See* Chart at 4, *supra.*

Hernandez claims that he opened a Swiss bank account to reduce the chance that potential
kidnappers in Venezuela could learn of his assets.  Hernandez Mem. at 4-5.  This argument rings
false for several reasons.  First, by the time Hernandez opened the first UBS account in 2001, he
had lived in the United States for more than 10 years, and he and his family lived safely in New
York City during the entire period that he owned the accounts.  No one living and working in
New York City for more than 10 years legitimately believes that that they must keep money
hidden in Switzerland to protect their family from kidnapping.  Second, even if Hernandez truly
believed that he needed a Swiss bank account to protect his family, this belief has nothing to do
with the requirement to file accurate U.S. tax returns.  As a corporate tax adviser to his clients,
Hernandez very likely understood that tax returns filed with the IRS are protected by strict
privacy laws and would never be disclosed to criminals.  Third, Hernandez's contention is belied
by the fact that, from at least 2001 to the present, Hernandez has maintained sizeable amounts of
cash and other investments in United States financial institutions.  *Cf.* PSR ¶ 70.  Indeed, UBS
records, information from a confidential source, and documents recovered in an unrelated law

Hon. Denny Chin
September 10, 2010
Page 10

enforcement search establish that Hernandez had substantial investments in a U.S.-based investment fund called FTC Emerging Markets during the relevant period.  UBS records alone show that, in 2007 and 2008, Hernandez transferred more than $6 million from his Pondbridge Account to FTC Emerging Markets accounts in the United States.  These transfers are shown in the following chart; the corresponding documents are attached as Exhibit P.

| Date of Transfer | Amount ($) | Exhibit |
|---|---|---|
| 6/15/2007 | 180,000 | P – 1 |
| 8/13/2007 | 950,000 | P – 2 |
| 11/5/2007 | 2,000,000 | P – 3 |
| 1/18/2008 | 100,000 | P – 4 |
| 5/22/2008 | 700,000 | P – 5 |
| 6/23/2008 | 340,000 | P – 6 |
| 9/19/2008 | 130,000 | P – 7 |
| 9/22/2008 | 55,000 | P – 8 |
| 9/25/2008 | 100,000 | P – 9 |
| 10/7/2008 | 322,697.92 | P – 10 |
| 12/1/2008 | 2,000,000 | P – 11 |
| **Total** | **6,877,697.92** | |

If Hernandez had been concerned about kidnapping, he would not have transferred almost $7 million from his UBS Pondbridge Account to FTC Emerging Markets accounts in the United States.

Accordingly, based on the seriousness of Hernandez's offense, he should be sentenced to a Guidelines sentence of 18 to 24 months' imprisonment.  This factor alone counterbalances the family circumstances factor that is discussed in the Government's supplemental sentencing letter.

### D.     Hernandez Should Receive a Guidelines Sentence Based on the History and Characteristics of the Individual

Hernandez's personal and professional background heighten the seriousness of the offense and the importance of general deterrence in this case.  Hernandez is an educated, rich, and professionally successful 44-year old man.  As described in more detail below, internal UBS due diligence records relating to Hernandez show that, as of in or about 2006, Hernandez had a net worth of $20.2 million, and that he managed approximately $54 million in assets held in Switzerland.  Hernandez omitted much of this information from the financial statement that he submitted to the Probation Department.

Hon. Denny Chin
September 10, 2010
Page 11

  Hernandez's professional success began at a young age.  According to UBS due diligence records, in or about 1994, before this 30th birthday (he was born in 1965), Hernandez took over this father's real estate business in Caracas, Venezuela.  The business had 11 employees and a yearly net income of one million dollars.  The company was in the business of buying apartments, restoring them, and selling them.  *See* UBS Due Diligence Form for Sensitive Clients, attached as Exhibit Q, at A-0562_0220 (hereinafter, "UBS Due Diligence Form"); *see also* UBS FIM (Financial Intermediary) Proposal & Approval Form, dated June 30, 2005, attached as Exhibit R, at PA_0562_0055 (hereinafter, "UBS FIM Form").

  Hernandez has a university degree and has worked for much of his adult life in the financial services industry in New York City.  PSR ¶ 9; Hernandez Mem. at 3-4.  According to a curriculum vitae that Hernandez submitted to UBS, since 1998, Hernandez has been in the business of giving investment management advice, corporate tax advice and advice concerning offshore trusts and foundations – the very vehicles that he used to commit the offense in this case.  PSR ¶ 9.  (The nominee corporations that he used to hold his UBS accounts were incorporated in the British Virgin Islands  and Panama.  PSR ¶ 11, 15.).

  UBS due diligence records show that, as of in or about 2006, Hernandez had a net worth of approximately $20.2 million.  *See* UBS Due Diligence Form, Exhibit Q, at A-0562_0220.  UBS described Hernandez's assets as follows:

- $8.77 million in assets at UBS in Switzerland;
- $5 million in assets at BNP Paribas and Deutsche Bank;
- $2.5 million in real estate (one apartment in New York and one in Miami);
- $1 million investment in a cleaning company called Basurvenca;
- $2 million investment in a water company
- $1.7 million investment in a real estate company.
- $200,000 investment in a Venezuelan basketball team.

UBS Due Diligence Form, Exhibit Q, at A-0562_0220 and A-0562_0222; UBS FIM Form, Exhibit R, at PA_0562_0057.  Many of these assets were not listed on Hernandez's financial disclosure to the Probation Department, assuming the Probation Department accurately summarized the report in the PSR.  *See* PSR  ¶ 70-75.

  In addition, the UBS FIM Form states that Hernandez managed $54 million in his clients' money at five different financial institutions in Switzerland as of 2005: $19 million at UBS; $15 million at Credit Suisse in Zurich; $10 million at Deutsche Bank in Geneva; and $10 million at BNP Paribas in Geneva.  UBS FIM Form, Exhibit R, at PA_0562_0056.

  These UBS due diligence documents (Exhibits Q and R) are reliable.  First, the purpose of the documents was to evaluate Hernandez for purposes of Swiss Know Your Customer laws, and to evaluate whether UBS should compensate Hernandez as an introducing agent.  The bank had every incentive to record accurate information on such documents.  Second, much of the information contained in the documents can be verified from other sources.  For example:

Hon. Denny Chin
September 10, 2010
Page 12

- Hernandez's work history is described accurately in the due diligence documents. *Compare* UBS Due Diligence Form, Exhibit Q, at A-0562_0220; UBS FIM Form, Exhibit R, at PA_0562_0057, *with* PSR ¶ 66-69.

- Personal details concerning Hernandez are accurately reported in the due diligence documents, including his home and business addresses in New York and the nature of his financial advisory business. *See* UBS Due Diligence Form, Exhibit Q, at A-0562_0218 through A-0562_0222; UBS FIM Form, Exhibit R, at PA_0562_0055.

- On the forms, Hernandez's residences in New York and Miami (Key Biscayne) are correctly valued at approximately $2.6 million. *See* PSR ¶ 71.  (The Due Diligence Form does not list Hernandez's apartment on West 56th Street, which he used as an office.)

- The Due Diligence Form correctly shows that Hernandez had $8.8 million in UBS investments as of 2006. *See* Chart at 4, *supra*.

- Hernandez admitted to the Probation Department that he had an investment in a water company, though he valued that investment at $30,000 as of 2010 (PSR ¶ 74), whereas UBS valued it at $2 million as of 2006.

The UBS Due Diligence Form does not include the value of Hernandez's jointly owned $250,000 worth of "jewelry, art, etc" (PSR ¶ 70[1]), or the value of his holdings with FTC Emerging Markets.

In light of UBS records showing that Hernandez had a net worth of $20.2 million as of 2006, Hernandez's claim to the Probation Department that he now has a negative net worth (*see* PSR ¶ 73) is not plausible.  The financial statement that Hernandez submitted does not appear to include the value of his UBS holdings, which were $5.6 million at the end of 2007, or the value of his investments at FTC Emerging Markets. *See* PSR ¶ 70-75.

Because Hernandez's financial statement to the Probation Department is so inconsistent with these due diligence documents, the Government respectfully requests that the Court order the Probation Department to provide a copy of Hernandez's financial statement and any supporting documents to the Government.

Even assuming that Hernandez's net worth is negative, he still "expects financial assistance from family members if needed to meet the family's financial needs upon exhaustion of his savings and other assets."  PSR ¶ 76.  He also has access to almost $8 million dollars in

---

[1]     The Probation Department advised the Government that $125,000 figure that appears in PSR ¶ 70 as the value of "Jewelry, Art, Etc." constitutes Hernandez's half share of the $250,000 in such items that he jointly owns with his wife.

Hon. Denny Chin
September 10, 2010
Page 13

undersecured loans from one of his former clients, a wealthy Venezuelan citizen named Danilo Diaz Grenados. These loans include a seven million dollar loan secured by only $3.6 million in real estate (in a declining real estate market), and a promise of $815,000 in additional loans, part of which is secured by real estate in Manhattan. *See* PSR ¶ 72-74. Remarkably, the $7 million note contains no repayment schedule; it does not require the payment of any interest or principal before February 10, 2020. PSR ¶ 72. This arrangement is consistent with a situation in which the holder of the note, Hernandez's client, knows that Hernandez has other assets.

> **E.** **Hernandez Should Receive a Guidelines Sentence Based on the Need for General Deterrence**

General deterrence is a particularly important sentencing factor in tax cases. And as noted as the beginning of this letter, Hernandez's sentence is unusually important because it is the first genuinely contested sentencing in any of the UBS customer cases around the country, at a time when the Government's investigation of offshore banking is ongoing.

The Sentencing Commission has recognized the significance of general deterrence in tax cases in an introductory note to the tax provisions of the Guidelines. The Commission stated:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Ch. 2, Pt. T, 1, Introductory Commentary (*quoted with favor in United States* v. *Cutler*, 520 F.3d 136, 163 (2d Cir. 2008). Earlier this year, the Fourth Circuit made the same point in a tax evasion case:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States* v. *Engle*, 592 F.3d 495, 502 (4th Cir. 2010). Judge Weinfeld articulated the point in a pre-Guidelines setting:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The

Hon. Denny Chin
September 10, 2010
Page 14

> income tax laws of our country in effect reflect an honor system
> under which the citizens are required to cooperate with the
> government, to file true and accurate returns. I have been of the
> view that unless a citizen lives up to his responsibility there must
> follow, barring an extraordinary situation, a term of imprisonment
> as an example to other people in the community.

*United States* v. *Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13).

Finally, in 2010, Judge Castel echoed the point in the sentencing of a tax preparer who prepared false returns:

> [T]he fact of the matter is tax fraud is difficult to detect. We rely on tax preparers
> to provide honest advice to their customers so that a government can collect that
> which is honestly due and owing. It requires backbone and integrity in the quiet
> moments where no one else will know to say no to a client, certainly not to be the
> person showing the way to the client of how to be dishonest, how to cheat the
> government of the money. Lawful tax collection means that everyone pays their
> just and honest share. It means if we are going to have cheats, that honest people
> who would otherwise just pay their fair share must pay more or the government
> must cut back on programs for other deserving people. That's what happens. To
> suggest that it's victimless - - and I'm not saying that anyone here has suggested
> that - - but to characterize it as victimless is not accurate.
>
> So one of the motivating factors that I have before me is, I am not
> concerned so much with protecting the public from further crimes of this
> defendant. I am content to say that I believe this defendant has learned a very
> painful lesson, and I don't think he is going to repeat the conduct, and there are
> ways that I have that do protect the public from further crimes of this nature from
> this defendant. But there is an important deterrent effect, and prison time is part
> of a shame process. It is hard and bitter pill to be imprisoned. There is a shame
> that goes with it, and I must say that that shame, apart from what we might say
> about or I say about just punishment, because part of it is just punishment, but part
> of it is also deterring others from similar crimes.

*United States* v. *Lubinof*, 09 Cr. 734 (PKC), June 25, 2010, Tr. 28-29 (attached as Exhibit T).

These findings apply equally to Hernandez. He should be given a Guidelines sentence of 18 to 24 months to deter others from concealing foreign bank accounts from the IRS to evade taxes, and to encourage taxpayers with such accounts to voluntarily disclose to the IRS.

Hon. Denny Chin
September 10, 2010
Page 15

     **F.**     **The Need to Avoid Unwarranted Sentencing Disparities**

     A Guidelines sentence of 18 to 24 months for Hernandez is consistent with the need to avoid unwarranted sentencing disparities under Section § 3553(a)(6).  To date, nine other UBS customers have been sentenced in federal courts around the country for failing to report a Swiss-based UBS account, and their sentences have ranged from probation to 10 months' imprisonment.  However, all of these cases are distinguishable from Hernandez's situation.

     In eight of the nine cases, the defendants received cooperation departures pursuant to Section 5K1.1.  *See* Exhibit 3 to Hernandez Mem. (attaching judgments of conviction and related documents).  Hernandez has not cooperated with the Government and cannot receive such a departure.  Thus, a disparity between Hernandez's sentence and these sentences would be entirely warranted within the meaning of Section § 3553(a)(6).

     Incidentally, the three month sentence that Hernandez requests here is considerably lower than the sentence that one UBS customer-defendant received even with a Section 5K1.1 departure.  In *United States* v. *Jack Barouh*, 10 Cr. 20034 (S.D.Fl.), the Government requested, and the defendant received, a 10-month sentence, with a Section 5K1.1 departure.  Barouh's Guidelines range was 30 to 37 months' imprisonment based on a tax loss of between $400,000 and $1 million.  *See* Exhibit 3 to Hernandez Mem., at Tab 8.

     Of the nine UBS customers who have been sentenced to date, one defendant – Igor Olenicoff – did not receive a Section 5K1.1 departure.  But that sentence is an outlier for different reasons.  Olenicoff received a sentence of probation, but his under the facts of his case, the parties agreed that there was no tax loss and no enhancement for sophisticated means, resulting in a total offense level of 4 and a sentencing range of zero to six months' imprisonment.  *See* Government's Sentencing Position and Response to Pre-Sentence Report, *United States* v. *Igor M. Olenicoff*, 07 Cr. 227 (C.D. Cal.), March 31, 2008, at 2-3 (attached as Exhibit U).  As a result, Olenicoff's sentencing was, in effect, uncontested.  Hernandez's situation is entirely different because the parties have stipulated to a Guidelines range of 18 to 24 months, and Hernandez's Guidelines would be even higher (30 to 37 months) if they were recalculated taking into account the total tax loss (over $500,000) that he has now admitted through his amended tax returns.  In addition, the Olenicoff case was charged and sentenced well before UBS cooperated and agreed in February 2009 to provide customer bank records to the Government.  The Government has these records with respect to Hernandez, and therefore has all the necessary records to prove beyond a reasonable doubt Hernandez's ownership of his accounts, the income in the accounts and the corresponding tax loss, and his use of sophisticated means to mask his ownership (nominee corporations, among other things).  Accordingly, a significant disparity between Olenicoff's sentence and a Guidelines sentence for Hernandez would be entirely warranted.

Hon. Denny Chin
September 10, 2010
Page 16

### G.   Alternatives to Incarceration Should Not Result In A Lesser Sentence Here

Hernandez contends that he should receive a lower sentence based on recently-proposed amendments to the Guidelines and based on his willingness to do community service during a period of home confinement.  These arguments should be rejected.

First, Hernandez notes that the recently proposed amendments to the Guidelines, scheduled to take effect on November 1, 2010, are designed to provide more alternatives to incarceration.  Hernandez Mem. at 23.  However, these proposed amendments are explicitly intended for cases in which the defendant's offense is related to a drug or mental health treatment issue.  The new proposed Application Note 6 states (at § 5C1.1 (Imposition of a Term of Imprisonment)):

> a departure from the sentencing options authorized for Zone C of the Sentencing Table to accomplish a specific treatment purpose should be considered only in cases where the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, or suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed.

United States Sentencing Commission, "Notice of submission to Congress of amendments to the sentencing guidelines effective November 1, 2010," published May 14, 2010, 75 F.R. 27388-01, 27389, 2010 WL 1923584.  This proposal plainly does not apply to Hernandez.  He has no treatment issue and there is no evidence that his offense was related to a treatment issue.

Second, Hernandez contends that he should be given a lesser sentence in part because he is willing to do 500 hours of community service during a period of home confinement.  Home confinement with community service is not an adequate form of punishment here.  It does not account for the seriousness of Hernandez's offense, and it would be viewed by the public as a free pass, particularly for a financial services professional living in a two-million dollar apartment in Manhattan.  In a period of home confinement, Hernandez would likely spend his days little differently than he would spend them under no restrictions at all: leaving his apartment for religious, legal, professional, family, and medical (including exercise) purposes.  Moreover, Hernandez's offer to perform community service is undermined by the fact that he only just began performing the volunteer service that he now proposes to continue as part of his sentence, at a Catholic relief home.  *See* Hernandez Mem. at 26.  Plainly, this service was begun with an eye toward sentencing.

### H.   The Conditions of Hernandez's Confinement Should Not Lessen His Sentence

Hernandez tries to have it both ways by asking for such a short sentence that he might be designated to a work cadre at the Metropolitan Detention Center ("MDC"), and then claiming that he should be given credit for the fact that conditions there would be more harsh than if he were given a longer sentence that resulted in an assignment to a Federal Prison Camp.  Hernandez Mem. at 24.  The Court should not consider the conditions of Mr. Hernandez's

Hon. Denny Chin
September 10, 2010
Page 17

confinement any more than it considers those conditions when it sentences hundreds of defendants each year, many of whom have served long periods of time awaiting trial at the MDC or MCC.  Several courts in this district have noted that a departure on the basis of (pre-trial) conditions of confinement should be granted only 'where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner.'" *United States* v. *Teyer*, 322 F.Supp.2d 359 (S.D.N.Y. 2004) (*quoting United States* v. *Mateo*, 299 F.Supp.2d 201, 208 (S.D.N.Y. 2004)).  The same logic applies to Hernandez's request for a variance based on possible post-sentence conditions at MDC.

## I.      Conclusion

For these reasons and the reasons stated in the Government's sealed supplemental letter, the Government respectfully requests that the Court sentence Hernandez to a Guidelines sentence of 18 to 24 months' imprisonment.

> Respectfully submitted,
>
> PREET BHARARA
> United States Attorney
> Southern District of New York
>
>
> By: _____
>       David B. Massey
>       Assistant United States Attorney
>       (212) 637-2283

cc:     Nancy Kestenbaum, Esq.
         Barbara Hoffman, Esq.